**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**December 31, 2020**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

RIORDAN ANTHONY MAYNARD,

     Defendant - Appellant.

No. 19-1304

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:18-CR-00395-CMA-1)**
_____

Grant R. Smith, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with him on the briefs), Office of the Federal Public Defender for the District of Colorado, Denver, Colorado, appearing for Appellant.

Aaron M. Teitelbaum, Assistant United States Attorney (Jason R. Dunn, United States Attorney, with him on the brief), Office of the United States Attorney for the District of Colorado, Denver, Colorado, appearing for Appellee.
_____

Before **BRISCOE**, **BALDOCK**, and **McHUGH**, Circuit Judges.
_____

**BRISCOE**, Circuit Judge.
_____

Defendant Riordan Maynard, the former chief executive officer of two related companies, was convicted by a jury of twenty-six criminal counts arising out of his gross mismanagement of those companies. Counts 1 and 2 related to Maynard's

failure to pay corporate payroll taxes to the Internal Revenue Service and his related efforts to impede the government's investigation into those unpaid taxes. Count 3 arose out of Maynard's conspiracy with an employee to steal or embezzle employee benefit plan and health care contributions that were made by company employees. Counts 4 through 13 related to Maynard's theft or embezzlement of employee benefit plan contributions. Counts 14 through 26 related to Maynard's theft or embezzlement of employee health care contributions. The district court sentenced Maynard to 78 months' imprisonment. The district court also ordered Maynard to pay restitution to the Internal Revenue Service and to the employee-victims.

Maynard now appeals. Maynard argues that: (1) the district court misapplied the Sentencing Guidelines in calculating his offense level for Counts 1 and 2; (2) his convictions on Counts 14 through 26 were not supported by sufficient evidence; (3) the district court erred in calculating the restitution award for Counts 4 through 13; and (4) the district court plainly erred in calculating the restitution award for Counts 14 through 26.

Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we reject all of Maynard's arguments and affirm his convictions and sentence.

I

*Tax evasion*

Maynard founded Touchbase USA, Inc. (TBUSA) in approximately 2001, and served as its chief executive officer until approximately February 13, 2012. TBUSA provided telecommunications design and installation services for customers.

2

From 2009 until 2012, TBUSA accrued unpaid federal tax liabilities of $2,595,039.00, which were comprised primarily of unpaid federal payroll taxes. The Internal Revenue Service (IRS) contacted TBUSA regarding the delinquency and ultimately initiated collection actions against TBUSA, including levying on TBUSA's bank accounts.

In early 2012, Maynard responded to the IRS's collection efforts by shutting down TBUSA and starting a new company, Touchbase Global Services, Inc. (TBGSI), a few weeks later. TBGSI was essentially a continuation of TBUSA, operating with mostly the same employees and offering the same services to mostly the same customer base. Notably, TBGSI also continued TBUSA's practice of failing to pay its payroll taxes. By the end of 2013, TBGSI owed over $1 million in unpaid federal payroll taxes.

At that point, the IRS assigned a revenue officer, Joanna Randall, to collect TBGSI's unpaid taxes. Randall focused her efforts on determining who TBGSI's officers were. Randall did so for two reasons: to obtain necessary information about TBGSI's finances, and to determine who could be held personally liable for the payroll taxes that were deducted from the checks of TBGSI's employees but never paid to the IRS. Maynard falsely denied being an officer of TBGSI and told Randall that his brother, Magnus Maynard, was in charge of TBGSI. In fact, however, Magnus had no involvement in running the company.

In late 2013, Randall began levying on TBGSI's corporate bank account in an effort to recover some of the unpaid taxes. Unbeknownst at the time to Randall,

3

however, Maynard was engaging in efforts to transfer funds from TBGSI's corporate bank account to his own personal bank account in order to avoid Randall's levying attempts.

TBGSI made tax payments to the IRS in 2014 and 2015. Randall's involvement with TBGSI ceased in March 2015, after TBGSI entered into an installment agreement with the IRS to pay its outstanding tax liability.

In the second quarter of 2016, however, TBGSI began to once again avoid making necessary tax payments to the IRS. TBGSI subsequently defaulted on its installment agreement with the IRS. Consequently, the IRS assigned a new revenue officer, Crystal Figueroa, to collect TBGSI's unpaid taxes.

In early 2017, Figueroa began levying on TBGSI's bank account in an attempt to recover the unpaid taxes. At that time, Maynard and Christina Elbers, an Australian citizen who served as TBGSI's chief financial officer, began moving money out of TBGSI's corporate bank account and into Maynard's personal bank account to shield those monies from the levies. The IRS responded by expanding its collection activities in approximately April 2017. At that time, the IRS began sending letters to TBGSI's customers instructing them to pay the IRS directly for services rendered by TBGSI. Maynard and Elbers in turn responded by contacting those TBGSI customers who received letters from the IRS and telling them, falsely, that the IRS letters were sent in error and that the IRS would soon be retracting them. Maynard and Elbers also told those TBGSI customers to hold their funds for eventual payment to TBGSI, rather than paying the IRS.

4

Maynard and Elbers failed to respond honestly to the IRS's requests for a list of TBGSI's customers. The IRS sought this list in order to determine TBGSI's cash flow and accounts receivable. Maynard and Elbers instead provided the IRS with a list of only those TBGSI customers who they thought the IRS was already aware of. In other words, Maynard and Elbers omitted some of TBGSI's customers from the list in an attempt to continue receiving payments from those customers without interference from the IRS. Maynard and Elbers also deliberately delayed invoicing certain customers for services rendered on the theory that customers who had not received an invoice from TBGSI would not be obligated to pay any money to the IRS if the IRS sent them a levy notice.

*Embezzlement of health insurance premiums and 401(k) contributions*

TBGSI offered its employees optional health insurance coverage and a 401(k) savings plan. For those employees who chose to purchase health insurance coverage, premiums were to be deducted by TBGSI from their paychecks and forwarded to the contracted insurer. As for the 401(k) plan, TBGSI employees selected the amount, if any, they wanted withheld from each paycheck. TBGSI promised to match employee 401(k) contributions at a rate set by formula.

In 2017, the last year of TBGSI's operations, Maynard mishandled thousands of dollars of employee health insurance premiums and 401(k) contributions. Although TBGSI withheld the funds as directed by its employees, TBGSI, per Maynard's directions, stopped forwarding the health insurance premiums to the contracted insurer, United Healthcare, and did not pay the withheld 401(k)

5

contributions funds into TBGSI's retirement plan. TBGSI also, per Maynard's directions, failed to make its promised "employer matching" contributions to the retirement plan during this period.

By June 2017, TBGSI owed United Healthcare approximately $119,000 in past due premiums. United Healthcare responded to this nonpayment by retroactively canceling TBGSI's employees' health insurance coverage back to March 4, 2017. As a result, TBGSI employees who obtained medical care between April and June of 2017 received no insurance coverage for that care and instead were held personally responsible for the costs associated with that care. The total amount of denied claims from United Healthcare during this period for all TBGSI employees was approximately $40,204.32.

After United Healthcare cancelled TBGSI's policy, TBGSI contracted for health insurance coverage from Anthem. Maynard falsely told his employees that he made the switch due to a rate dispute with United Healthcare. TBGSI continued, at Maynard's direction, to deduct and retain premium payments from TBGSI employees' paychecks, rather than forwarding them on to Anthem. In September 2017, Anthem retroactively canceled TBGSI's policy back to the beginning of coverage in early July 2017. As a result, TBGSI employees had no health insurance coverage from Anthem and were held personally responsible for all medical expenses they incurred from July 2017 through September 2017. Those unpaid medical expenses totaled $95,438.55.

TBGSI ceased operations in September 2017.  At approximately that same time, investigators from the United States Department of Labor and the IRS began a criminal investigation into Maynard's management of TBUSA and TBGSI.

II

On July 27, 2018, a criminal complaint was filed in the United States District Court for the District of Colorado charging Maynard with one count of corruptly impeding the administration of tax laws, in violation of 26 U.S.C. § 7212(a).

Less than a month later, a federal grand jury returned a twenty-six count indictment against Maynard and Elbers.  Count 1 charged Maynard with corruptly impeding the administration of tax laws, in violation of 26 U.S.C. § 7212(a).  Count 2 charged Maynard and Elbers with conspiracy to defraud the United States, in violation of 18 U.S.C. § 371.  Count 3 charged Maynard and Elbers with conspiracy to steal or embezzle payments made by employees into their 401(k) and health care plans, in violation of 18 U.S.C. § 371.  Counts 4 through 13 charged Maynard and Elbers with theft or embezzlement from an employee benefit plan (i.e., the 401(k) plan), in violation of 18 U.S.C. §§ 664 and 2.  Counts 14 through 26 charged Maynard and Elbers with theft or embezzlement in connection with health care (i.e., Maynard's theft of TBGSI employee premium payments for health care), in violation of 18 U.S.C. §§ 669 and 2.  Lastly, the indictment included a forfeiture allegation pursuant to 21 U.S.C. § 853.

The case against Maynard proceeded to trial in May 2019.[1] At the conclusion of the evidence, the jury found Maynard guilty on all twenty-six counts alleged in the indictment.

The district court sentenced Maynard to 78 months' imprisonment. This included 36 months on the tax counts, 60 months on the counts related to 401(k) theft, and 78 months on the counts related to health insurance premium theft, with all sentences to run concurrently to each other. The district court's sentence on the tax counts was based on a total tax loss of $4,970,694.91, which was the total amount of unpaid payroll taxes owed by TBUSA and TBGSI. The district court in turn ordered Maynard to pay restitution to the IRS in that same amount.

The district court calculated the loss amount on the 401(k)-related counts to be $111,974.04, which included the 401(k) contributions withheld from employees' paychecks but never passed on to the retirement plan, and the employer matching amounts that Maynard promised but never paid on behalf of his employees.

The district court calculated the loss on the health insurance-related counts to be $185,921.91, which included premium payments withheld from employees' paychecks but never passed on to the health plan, as well as the amounts of unpaid medical claims that employees incurred because of the retroactive cancellation of their insurance policies.

---

[1] Elbers, who purportedly lived in Australia during much of the time frame covered by the indictment, has not yet made her initial appearance in district court. Aple. Br. at 4 n.2.

8

As regards the loss calculated by the district court in both the 401(k)-related counts and the health care-related counts, the district court ordered Maynard to pay restitution to the affected employees in the amounts it had calculated.

Judgment in the case was entered on August 21, 2019. Maynard filed a timely notice of appeal.

III

Maynard asserts four issues on appeal. First, he argues that the district court procedurally erred at the time of sentencing by treating him as if he had been convicted of tax evasion. Second, Maynard argues that his convictions for theft in connection with healthcare (Counts 14-26) are not supported by sufficient evidence and therefore must be vacated. Third, Maynard argues that the district court procedurally erred at the time of sentencing by miscalculating the restitution award for Counts 4 through 13. Fourth, Maynard argues that the district court plainly erred in calculating the restitution award associated with Counts 14 through 26.

*Determination of loss amounts for Counts 1 and 2*

In his first issue on appeal, Maynard argues that the district court, in calculating his offense level for Counts 1 and 2, "erred when it determined that the 'loss' amount[] under U.S.S.G. § 2T1.1 was the total amount of taxes owed by TBGSI and TBUSA." Aplt. Br. at 12. In support, Maynard notes that under § 2T1.1, "the loss amount must reflect the loss caused by the object of the offense." *Id*. Maynard in turn notes that he "impeded the administration of internal revenue law by engaging in several acts that prevented the IRS from obtaining a portion of the

9

outstanding tax debt." *Id.* But, Maynard asserts, "[i]nstead of determining the loss caused by those acts, the district court erroneously ruled that the loss was the entire tax debt owed by TBGSI and TBUSA." *Id.* Maynard also argues that "the district court's loss determination is unmoored from the economic reality of the situation" because "[i]t is unrealistic to believe that the government would have ever obtained the full amount of the outstanding tax debt owed by TBUSA and TBGSI." *Id.* at 18. Maynard argues that "[n]either company had the ability to pay the outstanding tax debt," and thus "there is no evidence that the government would have collected nearly $5 million had [he] not violated 18 U.S.C. § 7212(a) or 18 U.S.C. § 371." *Id.*

"We review challenges to the procedural reasonableness of sentences for an abuse of discretion." *United States v. Worku*, 800 F.3d 1195, 1201 (10th Cir. 2015). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Id.*

Under the overarching abuse of discretion standard that applies to procedural reasonableness challenges, we review a district court's loss calculation methodology de novo and its actual loss calculations for clear error. *United States v. Snow*, 663 F.3d 1156, 1160 (10th Cir. 2011). A district court commits procedural error, in pertinent part, by "failing to calculate (or improperly calculating) the Guidelines range," "failing to consider the § 3553(a) factors," "or failing to adequately explain the chosen sentence." *Gall*, 552 U.S. at 51. "An error of law is per se an abuse of

10

discretion." *United States v. Sanchez-Leon*, 764 F.3d 1248, 1262 (10th Cir. 2014) (quotations omitted).

Count 1 of the indictment charged Maynard with corruptly endeavoring, from early 2012 to approximately September 2017, to obstruct or impede the due administration of internal revenue laws, in violation of 26 U.S.C. § 7212(a). The jury convicted Maynard of this count and, in doing so, had to find that Maynard knowingly obstructed or impeded a "tax-related proceeding," which the jury instructions defined to include "a particular investigation, audit, or other targeted administrative action." ROA, Vol. 4 at 60. Although the jury was not required to make specific findings about how Maynard obstructed or impeded the IRS's investigation, the indictment alleged several ways in which he did so: (a) closing TBUSA and opening TBGSI in order to avoid paying more than $2 million in federal payroll taxes owed by TBUSA; (b) in late 2013, falsely stating to an IRS employee that he was not an officer or employee of TBGSI; (c) in 2014 and 2017, transferring and causing to be transferred funds between TBGSI's bank account and his own personal bank account in order to defeat IRS levies that sought taxes owed by TBGSI; (d) in 2017, omitting material information regarding TBGSI's finances from submissions to the IRS in an effort to prevent the IRS from collecting funds from TBGSI's customers; and (e) in 2017, falsely informing TBGSI customers that IRS levies they received were sent in error.

Count 2 of the indictment charged Maynard and Elbers with conspiring, from February 2017 to October 2017, to defraud the United States and the IRS for the

11

purpose of impeding, impairing, obstructing, and defeating the IRS's assessment and

collection of federal taxes, in violation of 18 U.S.C. § 371. Count 2 alleged a number

of overt acts in support of the conspiracy, all of which the jury unanimously found at

trial. Those overt acts included repeatedly transferring money from TBGSI's bank

account to Maynard's personal bank account, contacting TBGSI customers and

telling them that IRS levies were "sent in error," failing to disclose to the IRS any

TBGSI customers that they believed had not received IRS levy notices, and

submitting to the IRS a form that omitted Maynard's personal bank account as an

asset of TBGSI.

The presentence investigation report (PSR) grouped Counts 1 and 2 together

for purposes of calculating an offense level.[2] ROA, Vol. 6 at 59. The PSR concluded

that the controlling Guideline for Count 1 was U.S.S.G. § 2T1.1, and that the

controlling Guideline for Count 2 was U.S.S.G. § 2T1.9. *Id*. The PSR in turn noted

that "[b]oth guidelines reference the use of the Tax Table at USSG §2T4.1." *Id*.

Applying that Tax Table, the PSR noted:

> According to the Government, it proved at trial that the defendant shut
> down TBUSA and restarted it as TBGSI in order to avoid paying more
> than $2.5 million TBUSA owed in [federal] payroll taxes. Then, TBGSI
> immediately incurred over $1 million in additional liabilities. By the
> time of its closure in 2017, TBGSI owed over $2.4 million in [federal
> payroll tax] liabilities. This results in a total tax liability of
> approximately $5 million. The tax loss is between $3,500,000, and
> $9,500,000; therefore, the base offense level is 24. USSG
> §§2T1.1(a)(1) and 2T4.1(J).

---

[2] Maynard does not object to this grouping.

*Id*.

Maynard objected to the PSR's calculation of his offense level for Counts 1 and 2. ROA, Vol. 4 at 267-275. Maynard conceded that "[t]he Government's calculation [of the loss] include[d] all payroll tax debt of both corporations at issue," but he argued that he "was not tried, nor convicted of willful failure to pay taxes." *Id*. at 270. Maynard noted that § 2T1.1(c) directs that "'the tax loss is the total amount of loss that was the object of the offense (i.e., the loss that would have resulted had the offense been successfully completed),'" *id*. at 269 (quoting U.S.S.G. § 2T1.1(c)), and he argued:

> The evidence presented at trial showed Mr. Maynard's goal was to obstruct the IRS to buy time in hopes that TBGSI would become solvent and catch up on missed payroll tax. Mr. Maynard was not trying to get out of paying payroll tax, nor did he fraudulently file inaccurate payroll tax numbers. Over the years, TBGSI paid a total of $2,030,950.07 in payroll tax and TBUSA paid $1,318,602.83 in payroll tax. The IRS would not have been owed any tax had Mr. Maynard's scheme been successful.

*Id*. at 270. Maynard also argued that, in any event, "[t]he tax loss amount [wa]s not the entire tax liability of TBGSI and TBUSA combined, but rather the money that the Government was deprived of by the criminal conduct," and he asserted that "this amount would be somewhere between $550,000 and $1,500,000." *Id*. at 271. In support of this assertion, he noted that the government presented evidence that "TBGSI obstructed and prevented the IRS from levying $1.2 million which was in [his] personal bank account," and that, "[h]ad this levy been successful TBGSI would

13

have ceased trading because it would not have had any money, and therefore it would [have] stopped incurring future tax debt." *Id*. at 271-72.

At sentencing, the district court rejected Maynard's objections. The district court instead "agree[d] with the Government that [Maynard's] conduct [wa]s similar to tax evasion or willful failure to pay taxes." ROA, Vol. 7 at 1453. The district court noted that "TBGSI did, in fact, file tax returns, but the defendant willfully evaded efforts to collect those taxes and willfully failed to pay those taxes." *Id*. The district court in turn concluded that "[t]he methods [of calculation] described in Section 2T1.1(c)(1) and (3) [reasonably] fit the particular circumstances of this case," even if they "d[id] not precisely match the facts." *Id*. at 1454. The district court found that "[b]y shutting down TBUSA and obscuring the relationship between TBUSA and TBGSI, [Maynard] was able to willfully evade and failed to pay the 2.5 million TBUSA owed the IRS." *Id*. The district court further found that "[h]ad [Maynard] not engaged in the obstructive act of opening TBGSI and concealing its status as a successor entity, the entire tax debt of TBGSI, approximately 2.4 million, would not have accrued." *Id*. Lastly, the district court found that "[e]ven after establishing TBGSI, [Maynard] engaged in a litany of acts to obstruct and impede tax collection." *Id*. at 1454-55.

Section 2T1.1 of the Sentencing Guidelines, which the district court applied to Count 1, is entitled "Tax Evasion; Willful Failure to File Return, Supply Information, or Pay Tax; Fraudulent or False Returns, Statements, or Other Documents." Subsection (a) thereof directs a district court to determine the base offense level by

14

applying the Tax Table found in § 2T4.1 to "the tax loss" associated with the offense

or, "if there is no tax loss," to apply a base offense level of 6. U.S.S.G. § 2T1.1(a).

Subsection (c), entitled "Special Instructions," states, in pertinent part, that "[i]f the

offense involved tax evasion . . . , the tax loss is the total amount of loss that was the

object of the offense (i.e., the loss that would have resulted had the offense been

successfully completed)." *Id*. § 2T1.1(c)(1). Subsection (c) also states, in pertinent

part, that "[i]f the offense involved willful failure to pay tax, the tax loss is the

amount of tax that the taxpayer owed and did not pay." *Id*. § 2T1.1(c)(3).

The Application Notes to § 2T1.1 provide specific examples of tax loss, but

none of those are similar to the offense conduct at issue in this case. The Application

Notes do, however, also state:

> In determining the tax loss attributable to the offense, the court should
> use as many methods set forth in subsection (c) and this commentary as
> are necessary given the circumstances of the particular case. If none of
> the methods of determining the tax loss set forth fit the circumstances of
> the particular case, the court should use any method of determining the
> tax loss that appears appropriate to reasonably calculate the loss that
> would have resulted had the offense been successfully completed.

*Id*. cmt. 1. In addition, the Application Notes state that "[i]n determining the total tax

loss attributable to the offense . . . , all conduct violating the tax laws should be

considered as part of the same course of conduct or common scheme or plan unless

the evidence demonstrates that the conduct is clearly unrelated." *Id*. cmt. 2. This

includes, according to the Application Notes, "a continuing pattern of violations of

the tax laws by the defendant," as well as when "the defendant uses a consistent

method to evade or camouflage income." *Id*.

15

Section 2T1.9 of the Guidelines, which the district court applied to Count 2, is entitled "Conspiracy to Impede, Impair, Obstruct, or Defeat Tax." It directs a district court, in determining a defendant's base offense level, to "[a]pply the greater" of the "[o]ffense level determined from §2T1.1 or §2T1.4, as appropriate," or "10."[3] U.S.S.G. § 2T1.9(a). The Application Notes to § 2T1.9 explain, in pertinent part, that "[t]he base offense level is the offense level . . . from §2T1.1 or §2T1.4 (whichever guideline most closely addresses the harm that would have resulted had the conspirators succeeded in impeding, impairing, obstructing, or defeating the Internal Revenue Service) if that offense level is greater than 10. Otherwise, the base offense level is 10." *Id.* cmt. 2.

Section 2T4.1 of the Guidelines, i.e., the Tax Table referenced in the foregoing Guidelines, provides, in pertinent part, that if the tax loss is "[m]ore than $550,000," but less than $1,500,000, a base offense level of 20 applies. U.S.S.G. § 2T4.1(H). It further provides that if the tax loss is "[m]ore than $3,500,000," but less than $9,500,000, a base offense level of 24 applies. *Id.* § 2T4.1(J).

Applying these Guideline provisions to the facts presented in this case, we conclude that the district court did not err in calculating the loss associated with Counts 1 and 2 and, in turn, applying a base offense level of 26 to those counts. As

---

[3] Section 2T1.4 of the Guidelines applies to "Aiding, Assisting, Procuring, Counseling, or Advising Tax Fraud." Similar to § 2T1.1, it directs a district court, in determining a defendant's base offense level, to apply the "[l]evel from §2T4.1 (Tax Table) corresponding to the tax loss," or "6, if there is no tax loss." U.S.S.G. § 2T1.4(a).

16

the district court noted, Maynard's offenses of conviction were similar in some respects to both tax evasion and willful failure to pay taxes, i.e., the first and third methodologies specified in § 2T1.1(c). Although the payroll taxes at issue were the legal obligation of TBUSA and TBGSI, the evidence established that Maynard exercised complete control over both corporations and routinely took actions to cause both corporations to pay as little accrued payroll tax as possible, and in turn to prevent the IRS from levying on corporate funds to recover those unpaid payroll taxes.[4] As anticipated by the Application Notes to § 2T1.1, Maynard exhibited a continuing and similar pattern of illegal conduct when he ran both corporations, and all with the goal of avoiding the payment of taxes owed. Maynard would have us limit the tax loss to what he defines as the object of the offense—his acts in impeding the IRS from obtaining from specific accounts a portion of the outstanding tax debt which he contends is somewhere between $550,000 and $1,500,000. We reject Maynard's attempt to reduce his base offense level in this way.

The district court was correct, in our view, in determining that Maynard's conduct at TBUSA caused the IRS a tax loss of approximately $2.5 million, and that his conduct at TBGSI caused the IRS an additional tax loss of approximately $2.4 million. And, contrary to Maynard's arguments on appeal, nothing in the Guidelines provides that a defendant's inability to pay an accrued tax liability should be taken

---

[4] With TBUSA, Maynard shut down the corporation and started a new corporation to avoid paying the accrued taxes. With TBGSI, Maynard took steps to prevent the IRS from levying on corporate accounts and customer payments that were owed to TBGSI.

17

into account in order to effectively reduce the tax loss at issue. *See United States v. Brimberry*, 961 F.2d 1286, 1292 (7th Cir. 1992) (rejecting defendant's argument that tax loss should have been limited to what the government realistically could have expected to collect from her). Thus, for all of these reasons, we conclude that the district court's calculation of the base offense level for Counts 1 and 2 was not erroneous.

*Sufficiency of evidence – Counts 14 through 26*

In his second issue on appeal, Maynard argues that the government failed to present sufficient evidence at trial to support his convictions on Counts 14 through 26 for theft or embezzlement in connection with health care, in violation of 18 U.S.C. § 669. Section 669, Maynard asserts, requires proof that a defendant willfully embezzled, stole, or converted "assets of a health care benefit program." Aplt. Br. at 21. Maynard argues that "the government presented no evidence" in this case "that the funds withheld from [TBGSI] employee paychecks" for health insurance premiums "were 'assets' that belonged to that program." *Id*. at 22. In other words, he argues, "[w]hile [he] undoubtedly owed money to both Anthem and [United Healthcare], the funds withheld from the [TBGSI] employee paychecks never belonged to either of these insurance providers." *Id*. Maynard argues that because "he [merely] failed to pay his bill" and "did not defraud an insurance provider," "this Court should vacate these convictions and remand to the district court for resentencing." *Id*. at 23.

18

Generally speaking, "we review the sufficiency of the evidence de novo to determine whether a rational jury could find the defendant guilty beyond a reasonable doubt." *United States v. Mobley*, 971 F.3d 1187, 1195 (10th Cir. 2020) (quotations omitted).

The government argues in its response brief, however, that Maynard waived his challenge to the sufficiency of evidence on his § 669 convictions. Aple. Br. at 27-28. In support, the government notes that "[a]fter the government rested" at trial, "Maynard moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, but he expressly limited his motion to count 1 of the indictment . . . and did not address the counts charging violations of . . . § 669." *Id*. The government further notes that "Maynard did not renew the motion in any form at the close of all the evidence or after the jury returned its verdict." *Id*.

Federal Rule of Criminal Procedure 29 addresses motions for judgment of acquittal and provides, in pertinent part:

> (a) **Before Submission to the Jury**. After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction. If the court denies a motion for a judgment of acquittal at the close of the government's evidence, the defendant may offer evidence without having reserved the right to do so.
> * * *
> (c) **After Jury Verdict or Discharge**.
> (1) **Time for a Motion**. A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later.
> (2) **Ruling on the Motion**. If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal. If the jury

19

has failed to return a verdict, the court may enter a judgment of acquittal.
(3) **No Prior Motion Required**. A defendant is not required to move for a judgment of acquittal before the court submits the case to the jury as a prerequisite for making such a motion after jury discharge.
* * *

Fed. R. Crim. P. 29(a), (c).

"When a defendant challenges in district court the sufficiency of the evidence on specific grounds, 'all grounds not specified in the motion are waived.'" *United States v. Goode*, 483 F.3d 676, 681 (10th Cir. 2007) (quoting *United States v. Kimler*, 335 F.3d 1132, 1141 (10th Cir. 2003)). "Although specificity of grounds is not required in a Rule 29 motion, where a Rule 29 motion is made on specific grounds, all grounds not specified are waived." *Id.* (quotations omitted).

At the close of the government's evidence in this case, Maynard's counsel moved for judgment of acquittal. In doing so, Maynard's counsel focused on the "acts listed in the first count." Suppl. ROA, Vol. 3 at 7. Maynard's counsel also stated, near the outset of his argument: "In regards [sic] to the other counts, we would rest on the record." *Id.* at 9. Maynard's counsel and the district court discussed in detail the elements of Count 1 and the evidence that was presented by the government in support of Count 1. After that discussion, the district court asked Maynard's counsel, "Is that the entirety of your argument? So, only as to Count 1 is the only one you are moving for a MJOA?" *Id.* at 12. Maynard's counsel responded, "Yes, Your Honor." *Id.* After hearing from government counsel regarding Count 1, the district court "denie[d] . . . Maynard's Rule 29 motion as to Count 1." *Id.* at 15. The

20

district court then asked Maynard's counsel, "Is there anything further?" *Id*. Maynard's counsel responded "No, Your Honor." *Id*. At no point thereafter did Maynard move for judgment of acquittal on any additional counts.

Maynard argues in his appellate reply brief that his counsel's initial reference to "rest[ing] on the record" as "to the other counts" was intended as "a general motion [for judgment of acquittal] as to the remaining counts," i.e., all counts other than Count 1. Aplt. Reply Br. at 8. That argument, however, is belied by the statements made thereafter by Maynard's counsel. As outlined, the district court specifically asked Maynard's counsel if he was moving for judgment of acquittal only as to Count 1 and Maynard's counsel responded yes. Consequently, and understandably, the district court did not address or rule on any of the other counts at issue. Therefore, we conclude that Maynard's current challenge to his § 669 convictions (Counts 14 through 26) has been forfeited and, at best, is subject to review on appeal only for plain error. *See Goode*, 483 F.3d at 681 (explaining that a defendant's failure to move for MJOA in district court "is more precisely termed a forfeiture").

Maynard makes no plain error argument in his opening appellate brief and instead only briefly mentions the plain error standards in his appellate reply brief. For that reason, we could deem the issue waived and decline to review it entirely because Maynard has effectively deprived the government of the opportunity to respond to his plain error arguments. *See United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019). We need not take that step, however, because even if we

21

review for plain error, it is apparent that Maynard cannot establish any error, let alone one that is plain.

Counts 14 through 26 of the indictment charged Maynard with violating 18 U.S.C. § 669. That statute, entitled "Theft or embezzlement in connection with health care," provides:

> (a) Whoever knowingly and willfully embezzles, steals, or otherwise without authority converts to the use of any person other than the rightful owner, or intentionally misapplies any of the moneys, funds, securities, premiums, credits, property, or other assets of a health care benefit program, shall be fined under this title or imprisoned not more than 10 years, or both; but if the value of such property does not exceed the sum of $100 the defendant shall be fined under this title or imprisoned not more than one year, or both.
>
> (b) As used in this section, the term "health care benefit program" has the meaning given such term in section 24(b) of this title.

18 U.S.C. § 669. Section 24(b) of Title 18, which is expressly referenced in § 669, provides:

> As used in this title, the term "health care benefit program" means any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.

18 U.S.C. § 24(b).

Counts 14 through 26 of the indictment alleged that Maynard and Elbers "knowingly and willfully embezzle[d], st[ole], and otherwise without authority convert[ed] to their own use . . . and intentionally misapplied any of the moneys, funds, securities, premiums, credits, property and other assets of the TBGSI health

22

plan, a health care benefit program as defined in Title 18, United States Code, Section 24(b) . . . ." Supp. ROA, Vol. 1 at 16-17. The indictment further alleged thirteen specific dates (extending from June 15, 2017, through December 15, 2017) when Maynard and Elbers embezzled, stole, or otherwise converted payroll salary deferrals from their employees that were intended by those employees to pay their health insurance premiums. *Id*. at 17.

At trial, the government presented testimony from Paula Musil, an investigator employed by the United States Department of Labor, to support Counts 14 through 26. Musil testified that TBGSI had "an existing health plan that eligible employees could elect to participate in." ROA, Vol. 7 at 1061. Musil explained that TBGSI contributed a flat amount toward each employee's health care premium payments, and that TBGSI employees would pay their remaining share of the health care premiums through a payroll deduction. *Id*. at 1061-62. Musil in turn testified that, based upon her review of corporate documents, Maynard and Elbers deducted the premium amounts from employees' paychecks, but failed to pass those amounts on to Anthem and United Healthcare. *Id*. at 1068-69. According to Musil, Department of Labor regulations required Maynard and Elbers to forward the employee premium deductions on to the insurers within 90 days of deduction from the employees' paychecks.[5] *Id*.

---

[5] Musil did not identify the precise regulation she was referring. We assume, however, that she was referring to 29 C.F.R. § 2510.3–102. That regulation defines the phrase "plan assets" to "include amounts (other than union dues) that a participant or beneficiary pays to an employer, or amounts that a participant has

Maynard argues that Counts 14 through 26 concerned two "health care benefit programs," i.e., the health insurance plan offered by United Healthcare and the health insurance plan offered by Anthem. Aplt. Br. at 21. That argument, however, ignores the broad definition of the statutory phrase "health care benefit program" that is outlined in § 24(b), as well as the language of the indictment in this case. As we have noted, the statutory definition includes "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." As we have also noted, the indictment in this case specifically alleged that Maynard and Elbers embezzled or stole assets belonging to "the TBGSI health plan." Supp. ROA, Vol. 1 at 16. In turn, the evidence presented at trial, consistent with the language of the indictment, unquestionably established that TBGSI set up a health care plan for its employees, under which TBGSI contracted with a health insurance company (i.e., first United Healthcare and then Anthem) to provide insurance coverage for its employees, and under which TBGSI both contributed a flat amount for each employee's coverage and also deducted from its employees' paychecks the remaining premium amounts. Thus, under the broad statutory definition, the "health

---

withheld from his wages by an employer, for contribution . . . , as of the earliest date on which such contributions . . . can reasonably be segregated from the employer's general assets." 29 C.F.R. § 2510.3–102(a)(1). The regulation in turn provides that "in no event shall the date determined pursuant to paragraph (a)(1) of this section occur later than 90 days from the date on which the participant contribution amounts are received by the employer . . . ." *Id.* § 2510.3–102(c).

24

care benefit program" at issue was TBGSI's "private plan . . . under which . . . medical benefit[s]" were "provided to" TBGSI's employees, and it included the contracted insurance companies that provided medical insurance benefits to TBGSI's employees.[6]  Understood in that way, the government's evidence clearly established that Maynard, together with Elbers, violated § 669 by effectively stealing the withheld employee premium payments.  More specifically, those health care premium payments were "moneys," "funds, and/or "premiums" that belonged to the plan.

For these reasons, we conclude that Maynard has failed to establish the existence of any error, let alone an error that was plain.  We therefore reject his challenge to the sufficiency of the evidence underlying Counts 14 through 26.

*Calculation of restitution award for Counts 4 through 13*

In his third issue on appeal, Maynard argues that the district court erred at the time of sentencing by miscalculating the restitution award for Counts 4 through 13.  Those counts pertained to Maynard's embezzlement or theft of TBGSI employees' 401(k) contributions.  The district court, Maynard notes, ordered him to "compensate the victims for not only the amount withheld from their paychecks but also for the amount that the employees expected to receive from the employer's matching [401(k)] contribution."  Aplt. Br. at 23–24.  Maynard asserts that he "objected to this award on the basis that the matching funds where [sic] not the subject of the 401(k)

---

[6] Indeed, Maynard concedes in his opening brief that "the government presented sufficient evidence to prove that the 'private contract between TBGSI and the health care providers' qualified as a 'health care benefit program' as that term is defined by statute."  Aplt. Br. at 22.

counts." *Id.* at 24 (citing ROA, Vol. 7 at 1469). Maynard argues that "[t]he district court's restitution award represents an erroneous application of the [Mandatory Victims Restitution Act (MVRA)]," which "limits restitution to the actual loss caused by the defendant's offense of conviction." *Id.*

"When reviewing a challenge to a restitution determination, we review the district court's application of the MRVA de novo, review its factual findings for clear error, and review the amount of restitution awarded for abuse of discretion." *United States v. Camick*, 796 F.3d 1206, 1223 (10th Cir. 2015) (quotations and brackets omitted).

The MVRA requires a district court, "when sentencing a defendant convicted of [an offense against property under Title 18]," to "order . . . that the defendant make restitution to the victim of the offense . . . ." 18 U.S.C. § 3663A(a)(1); *see also id.* § 3663A(c)(1)(A)(ii) (requiring restitution in all cases involving "an offense against property under this title"). For purposes of the MVRA, "the term 'victim' means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered . . . ." *Id.* § 3663A(a)(2). The MVRA provides, in relevant part, that "[i]n each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." *Id.* § 3664(f)(1)(A).

"Restitution is limited to losses caused by the conduct underlying the offense of conviction." *Camick*, 796 F.3d at 1223 (brackets and quotations omitted). "The

26

Government carries the burden of proving causation by a preponderance of the evidence in the context of restitution." *Id*. "The MVRA does not require absolute precision, but losses cannot be speculative." *United States v. Kalu*, 791 F.3d 1194, 1213 (10th Cir. 2015) (quotations omitted).

In this case, the district court calculated the loss amount associated with Counts 4 through 13 to be $111,974.04, which included the 401(k) contribution amounts withheld from employees' paychecks but never passed on to the retirement plan, interest on those withheld amounts, and the employer matching amounts (totaling $36,010.81) that Maynard and TBGSI promised but were never paid on behalf of TBGSI's employees. ROA Vol. 4 at 340; ROA Vol. 7 at 1469–71. At sentencing, Maynard objected to including the employer matching amounts on the grounds that those funds were simply owed and not paid, but otherwise were never stolen or embezzled from TBGSI employees. ROA Vol. 7 at 1469 ("There is no doubt that, by contract, the employees should have received that money, but it certainly wasn't deducted or stolen out of their paychecks, as the 401(k) payments, themselves, were."). The district court overruled that objection, concluding "that the full amount of the victims' 401(k) losses include[d] the employer matching contributions for each victim for 2017 because the employees were enticed to participate in the 401(k) program by the promise of a generous employer match." *Id*. at 1470.

Maynard appeals the district court's ruling, arguing that, for purposes of the MVRA, the only "loss caused by [his] violations of § 664" were "the assets that he

27

withheld from the employee paychecks and failed to deposit into a 401(k) plan."
Aplt. Br. at 25. We reject this argument.

The "Background" section of the indictment in this case alleged, in pertinent part, that TBGSI offered to its employees "a 401(k) savings plan" that "was subject to Title I of the Employee Retirement Income Security Act of 1974 ('ERISA')" and in turn "the provisions of Title 18, United States Code 664." Supp. ROA, Vol. 1 at 6. The indictment further alleged that "TBGSI employees selected the amount (if any) to be withheld from each paycheck for the 401(k) savings plan" and that "TBGSI promised to match employee contributions at a rate set by formula." *Id*. Counts 4 through 13 of the indictment expressly incorporated those allegations by reference. *Id*. at 15 ¶ 24.

At the trial in this case, the government, consistent with the allegations in the indictment, introduced an email written by Elbers and forwarded by Maynard to a prospective plan participant that explained in detail the employer matching component of the company's 401(k) plan; that email was dated March 3, 2017, months after Maynard and Elbers stopped forwarding employees' 401(k) contributions to the 401(k) plan.[7] ROA, Vol. 7 at 1095–96. Notably, Maynard does not dispute that he represented to plan participants that TBGSI would make employer matching contributions to the 401(k) plan.

---

[7] Elbers stated in the email that the company's "contribution [wa]s calculated as follows: 100% of the first 3% of deferred compensation plus 50% of the next 2% of deferred compensation (so effectively Touchbase contributions [sic] to a maximum of 4%)." ROA, Vol. 7 at 1095.

In sum, the evidence presented at trial, consistent with the allegations in the indictment, established beyond a reasonable doubt that Maynard carried out the theft or embezzlement of the 401(k) funds by promising those employer-matching funds to TBGSI's employees. Were it not for those promises, it is uncertain whether the employee-victims would have contributed to the 401(k) plan at all. In other words, it was those promises that placed Maynard in a position to be able to embezzle or steal the 401(k) contributions. We therefore conclude that the government carried its burden of showing that those promises were part of "the conduct underlying the offense of conviction," *Camick*, 796 F.3d at 1223 (quotation marks omitted), and that, as a result, the loss to each employee-victim necessarily included the promised employer-matching contribution that was associated with each 401(k) contribution. *See Kalu*, 791 F.3d at 1213–14 (affirming district court's restitution award under the MVRA that was based, in pertinent part, on misrepresentations made by the defendant to the victims regarding the salary they would receive if they accepted his offer of employment).

The dissent in this case suggests that restitution for Counts 4 through 13 should have been limited strictly to the 401(k) contribution amounts withheld from the employee-victims' paychecks. In support of its position, the dissent points to our decision in *United States v. Mendenhall*, 945 F.3d 1264 (10th Cir. 2019). There, we held that the MVRA does not allow a district court to order restitution "for losses related to, but not arising directly from, [the] defendant's offense of conviction." *Id*. at 1266. We therefore rejected the district court's inclusion of restitution amounts for

29

sixty-two stolen firearms because the defendant was only charged with and convicted of receiving, possessing, and concealing three of those firearms. *Id.*

In our view, Maynard's case is distinguishable from, and therefore not controlled by, *Mendenhall*. As we have discussed, the allegations in the indictment, which were ultimately supported by the evidence at trial, established that Maynard's promises of employee-matching funds were central to each of the theft/embezzlement offenses alleged in Counts 4 through 13 and proven at trial. More specifically, each stolen or embezzled employee 401(k) contribution was associated with a promised employer-matching amount that TBGSI, at Maynard's direction, failed to make. Thus, in terms of actual loss to the employee-victims, each of the ten counts of conviction included a stolen or embezzled employee contribution and an associated employer-matching contribution that Maynard promised but failed to make. We therefore respectfully reject the dissent's position.[8]

---

[8] Even assuming, for purposes of argument that the amount of restitution ordered by the district court for Counts 4 through 13 was erroneous, such error was harmless because the district court could have awarded the exact same amount of restitution under the MVRA for Count 3. *Cf. United States v. Owens*, 426 F.3d 800, 808-09 (6th Cir. 2005) (applying harmless error review to restitution issue that involved the MVRA). Count 3 charged Maynard and Elbers with conspiracy to steal or embezzle payments made by employees into their 401(k) and health care plans, in violation of 18 U.S.C. § 371, and alleged in pertinent part that Maynard and Elbers carried out the conspiracy by promising the employee-victims that TBGSI would make employer-matching 401(k) contributions. Supp. ROA, Vol. 1 at 12-15. Notably, we have held that "[c]onspiracy in violation of 18 U.S.C. § 371 is covered by the MVRA when the underlying object of the conspiracy is an offense against property." *United States v. Butler*, 694 F.3d 1177, 1183 (10th Cir. 2012). Therefore, the amount of restitution would not "change on remand." *Owens*, 426 F.3d at 809.

*Calculation of restitution award for Counts 14 through 26*

In his fourth and final issue on appeal, Maynard argues that the district court plainly erred in calculating the restitution award for Counts 14 through 26 which, as we have noted, involved theft or embezzlement in connection with health care, in violation of 18 U.S.C. § 669.

Where, as here, a defendant asserts a procedural reasonableness challenge on appeal but did not make that argument at the time of sentencing, we review the issue only for plain error. *United States v. Wireman*, 849 F.3d 956, 962 (10th Cir. 2017). "We will find plain error only when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id*. (quotations omitted). As the party alleging plain error, Maynard "has the burden of establishing the four elements of plain error." *United States v. Peña*, 963 F.3d 1016, 1023 (10th Cir. 2020).

At sentencing, the district court adopted without objection the following factual findings relevant to Counts 14 through 26 that were set forth in the PSR. From around 2012 to June 2017, TBGSI offered health insurance through United Healthcare to TBGSI employees. TBGSI paid $600 per employee towards premiums, and employees paid the remainder. TBGSI automatically deducted the participant contribution from each participant's paycheck. TBGSI was responsible for forwarding the full premium amounts to United Healthcare. Starting in March 2017, however, TBGSI stopped paying the premiums owed to United Healthcare. By June 2017, TBGSI owed United Healthcare approximately $119,000.

31

On July 5, 2017, United Healthcare retroactively terminated TBGSI's health insurance coverage back to March 4, 2017, due to Maynard's and Elbers' failure to pay the outstanding premiums. Maynard and Elbers did not tell TBGSI's employees that their health care coverage had been cancelled. Instead, Maynard and Elbers falsely informed TBGSI's employees that United Healthcare had proposed to raise premiums by 20% to 30%, and that, as a result, Maynard and Elbers had decided to contract with Anthem to provide health insurance to TBGSI's employees.

TBGSI's coverage with Anthem was supposed to begin effective July 1, 2017. Although TBGSI continued to withhold employee contributions for health insurance premiums, it failed to make any premium payments to Anthem for the coverage. Consequently, in September 2017, Anthem terminated coverage retroactive to July 1, 2017.

Maynard and Elbers kept for TBGSI's benefit a total of $50,279.04 from employee paychecks that was intended for health insurance premiums. That included employee contributions towards premiums for United Healthcare from March 4, 2017, to June 30, 2017, and employee contributions towards premiums for Anthem from July 1, 2017, to September 2017. Had TBGSI instead forwarded those premiums to United Healthcare and Anthem, its employees would have had health care coverage for the periods in question, including the payment of covered claims incurred.

At the time of sentencing, the government submitted without objection a chart listing the total amount of premiums withheld from eighteen TBGSI employees

32

between March 15, 2017, and September 15, 2017. ECF No. 117-3 at 1. The chart also listed, for each of those eighteen employees, the "Unpaid Claims" for United Healthcare and Anthem. *Id*. The district court relied on this evidence for purposes of calculating the restitution for Counts 14 through 26. More specifically, the district court determined, without objection from Maynard, that the appropriate restitution amount was "$185,921.91 for the health plan funds." ROA, Vol. 7 at 1468. That total, the district court noted, was "comprised of $50,279.04 for the premium withholdings from the employees' paychecks that were stolen," "$40,204.32 in unpaid claims for UnitedHealthcare," and "$95,438.55 in unpaid claims for Anthem."[9] *Id*.

In his appeal, Maynard concedes that "the district court was authorized to order restitution for [these] offenses" under the MVRA. Aplt. Br. at 26. But, he argues, "the district court's restitution order exceeds its statutory authority as the award amount exceeds the losses caused by [him] and puts the victims in a better position than they would have been had the crimes not occurred." *Id*. In other words, Maynard argues, "[t]he court's restitution award represents textbook double-counting." *Id*. at 27. He explains that "the loss caused by [his] conduct was either the amount of premiums withheld from each individual employee's paycheck *or* the

_____

[9] Thirteen of the eighteen employees had claims denied by United Healthcare. ECF No. 117-3 at 1. Nine of the eighteen employees had claims denied by Anthem. *Id*. Only two of the eighteen employees had no claims denied by either insurer. *Id*. The claims denied by United Healthcare ranged in amounts from $20.00 to $9,591.90. *Id*. The claims denied by Anthem ranged in amounts from $800.00 to $80,645.55. *Id*.

33

amount that the insurance company would have paid on the claims, but not both." *Id*. (emphasis in original). Maynard in turn argues that "[i]n order to put the victims back into the position that they would be in had the crimes not occurred, the court could choose between one of two options." *Id*. "The court could," he argues, "treat the victims as if they have never paid for health insurance—i.e., the victim would receive the amount of money withheld from their paychecks." *Id*. Alternatively, he argues, "the court could have put the victim in the position they would have been had [he] secured health insurance—i.e., the victim would receive the amount the insurance plan would have covered minus the premiums that the victims would have paid to obtain such health insurance." *Id*. Finally, Maynard argues that "the restitution award exceeds the actual loss suffered by the victims in that the district court failed to deduct from the denied claims any amount that the victim would have owed even if they had health insurance," and that "[n]otably absent from the district court's restitution award is consideration of the victim's deductible." *Id*. at 28.

We need not decide whether the district court erred for purposes of the first prong of the plain error test because, even assuming that it did, Maynard has failed to satisfy his burden under the second and third prongs of that test. "For an error to be plain, it must be an error that is clear or obvious under current, well-settled law." *United States v. Miller*, 978 F.3d 746, 763 (10th Cir. 2020) (quotation marks omitted). "Typically for an error to be contrary to well-settled law, either the Supreme Court or this court must have addressed the issue." *Id*. (quotation marks omitted). In this case, Maynard cites only to Supreme Court or Tenth Circuit cases

34

outlining general principles that are applicable to MVRA cases.[10]  For example,

Maynard cites to *Hughey v. United States*, 495 U.S. 411 (1990) for the principle that

"the MVRA only permits a restitution order that restores the victims to the position

they occupied before the crime."  Aplt. Br. at 26.  He also cites to *United States v.*

*Howard*, 784 F.3d 745, 750 (10th Cir. 2015) for the principle that a "restitution

award may not 'unjustly enrich crime victims or provide them a windfall.'"  *Id*.

These general principles, however, do not address the specific and unique situation

that is presented in this case regarding the restitution amounts associated with Counts

14 through 26.  And, as we shall discuss in more detail, it is far from "plain" that the

district court erred by failing to calculate restitution in the manner suggested by

Maynard.

Maynard argues that "the loss caused by [his] conduct was either the amount

of premiums withheld from each individual employee's paycheck *or* the amount that

the insurance company would have paid on the claims, but not both."  Aplt. Br. at 27

(italics in original).  Because the limited evidence in the record establishes that each

of the eighteen employee-victims was in a unique situation, it is not enough for

Maynard to argue that the district court plainly erred by failing to choose between

one category total or the other, i.e., awarding either the total of the withheld and

---

[10] The same holds true for the dissent.  *See* Dissent at 9–10.  Although the dissent suggests that these general principles are enough to conclude that the district court committed plain error, we disagree.  Neither Maynard nor the dissent cite to a single case that involved offenses, and in turn restitution issues, remotely similar to those at issue here.  And, although the dissent suggests that the alleged error here is "obvious," we respectfully disagree.  *Id.* at 9.

subsequently stolen premiums from all TBGSI employees or the total of the unpaid

medical claims for all TBGSI employees.[11]  Indeed, our review of the evidence

presented at the sentencing hearing indicates that, had the district court done so, it

would have unnecessarily benefitted Maynard at the expense of at least some of the

employee-victims.  For example, if the district court had awarded only the amount of

the unpaid medical claims, that would have left two of the employee-victims with no

recovery at all because they had no unpaid medical claims during the period from

March 15, 2017, to September 15, 2017.  In contrast, if the district court had awarded

only the amount of the withheld and stolen premium payments, that would have left

many of the employee-victims without proper restitution because their unpaid

medical claims exceeded the amounts of their withheld and stolen premium

payments.

If, as Maynard suggests, the goal of the MVRA is to restore the victim to the

position occupied before the crime, then the district court's restitution award satisfies

that goal and is not plainly erroneous.  By deducting amounts from each employee-

victim's paycheck for health insurance premium payments and keeping those

amounts for TBGSI's benefit instead of forwarding them to United Healthcare and

---

[11] For example, TBGSI employee Victor Gutierrez had $3,076.65 withheld from his paychecks for premiums, but had no unpaid medical claims.  ECF No. 117-3 at 1.  In contrast, TBGSI employee Alexis Nicholson had $2,554.11 withheld from her paychecks for premiums, and in turn had $91,637.35 in unpaid medical claims. *Id*.  As a third example, TBGSI employee Clare Lamy had $6,826.69 withheld from her paychecks for premiums, and in turn had $5,608.96 in unpaid medical claims. *Id*.

Anthem, Maynard financially harmed the employee-victims in two ways: (1) he effectively stole from them the amounts that were deducted from their paychecks and intended to be used as health insurance premium payments; and (2) he also caused the employee-victims to incur medical expenses that would otherwise have been covered under their health care plans with United Healthcare and Anthem.[12] In other words, Maynard's criminal acts caused the employee-victims direct out-of-pocket losses when he kept the deducted insurance premiums deducted from their paychecks, and when they had to pay uncovered medical bills. Only by ordering restitution which covers both losses would the employee-victims be made whole.

To the extent Maynard is arguing that the district court should have separately analyzed each employee's situation and attempted to determine what each employee's actual loss was, he provides us with no additional evidence to support his arguments. To be sure, the limited evidence in the record, as we have noted, establishes for each employee-victim the premium amounts withheld from their paychecks and, in turn, the total amount of unpaid claims that would otherwise have

---

[12] Both Maynard and the dissent would essentially pretend, with respect to those employee-victims whose uncovered medical expenses exceeded their withheld and embezzled health insurance premiums, that those employee-victims had health insurance coverage. Not only does this ignore the realities of what actually occurred, it would effectively reward Maynard financially by allowing him to retain the embezzled health insurance premiums. Nothing in the text of the MVRA, nor in our case law interpreting the MVRA, supports such a result. To the contrary, the plain text of the MVRA indicates that the restitution award is intended as a "penalty" equal to "the full amount of each victim's losses." 18 U.S.C. §§ 3663A(a)(1), 3664(f)(1)(A). And those losses, as we have discussed, included both the stolen premium amounts and the uncovered medical expenses.

been covered by United Healthcare and Anthem. But this evidence does not establish (a) the time period that employee-victim was covered by the two healthcare plans,[13] (b) when the unpaid medical claims were incurred,[14] or (c) how the two insurance plans would have operated in terms of deductibles. Those details, which Maynard does not address or attempt to establish with evidence, would have been important and necessary to the district court had it been obligated to make the calculations now suggested by Maynard for the first time on appeal.[15]

We also note that, to the extent Maynard suggests the district court should have engaged in a detailed analysis of each employee-victim's situation, this ignores well-established precedent holding that the calculation of a restitution award under

---

[13] For example, the government's chart indicates that TBGSI employee Gennaro Perrone had a total of $3,283.10 in premiums deducted from her paychecks and had $350.00 in unpaid medical claims that should have been covered by United Healthcare. Although we can infer from this evidence that Perrone intended to be covered by, and thus had premium payments deducted for, United Healthcare, it does not tell us whether Perrone intended to be covered by, and thus had premium payments deducted for, Anthem.

[14] If, for example, an employee incurred a medical claim on March 16, 2017, that should have been but was not covered by United Healthcare, and incurred no other medical claims thereafter, then, at least arguably, only the withheld premium amounts covering the March 16, 2017 occurrence should have been, under Maynard's theory, taken into consideration in offsetting the amount of the unpaid medical claim. In other words, this employee, under Maynard's theory, should have been awarded (a) the amount of the unpaid medical claim minus the withheld premium for the period covering the unpaid medical claim, and (b) the total amount of withheld premiums for the period following the occurrence of the unpaid medical claim.

[15] For these same reasons, we respectfully reject the dissent's suggestion that the district court should have "examin[ed] each employee individually and utilize[d] the greater of the embezzled premiums or the unpaid insurance claims." Dissent at 10.

38

the MVRA is not intended to be a full-blown trial of its own. Indeed, Congress itself made this very point when it enacted the MVRA. *See* S. Rep. No. 104-179, at 18 (1995), as reprinted in 1996 U.S.C.C.A.N. 924, 931 (cautioning that a district court's calculation of restitution in a criminal case is not to "become fora for the determination of facts and issues better suited to civil proceedings"). As a result, we have held that a district court need not calculate restitution under the MVRA "with exact precision." *United States v. Anthony*, 942 F.3d 955, 970 (10th Cir. 2020) (quotation marks omitted). We are therefore not convinced that the district court "plainly" erred by failing to precisely determine, including taking into account the workings of each insurance plan, the losses of each of the eighteen employee-victims.

We in turn conclude, for many of the same reasons, that Maynard has failed to establish, under the third prong of the plain error test, that the alleged error affected his substantial rights. "An error affects substantial rights if there is a reasonable probability that the error affected the outcome of the proceedings." *Miller*, 978 F.3d at 765 (quotation marks omitted). "In the sentencing context, we ask: Is there a reasonable probability that but for the court's error, the defendant would have received a lesser sentence?" *Id*. (quotation marks and brackets omitted).

As we have discussed, Maynard provides us with no evidence that is supportive of his arguments. For example, he argues, but fails to substantiate, that each of the unpaid medical claims considered by the district court would have been subject, under the terms of the United Healthcare and Anthem plans, to deductible amounts that the employee-victims would have been obligated to pay. Ultimately,

39

given the very limited evidence before us, we are unable to say there is a "reasonable probability" that the restitution amount for Counts 14 through 26 would have been lower had the district court engaged in a detailed analysis of each employee-victim's situation.

IV

For the reasons outlined above, we AFFIRM Maynard's convictions and sentence.

40

19-1304, *United States v. Maynard*

**McHUGH**, Circuit Judge, joining in part and dissenting in part:

I agree with the majority that the district court did not err in calculating

Mr. Maynard's Guidelines range and that substantial evidence supports Mr. Maynard's

convictions under 18 U.S.C. § 669. Accordingly, I join those portions of the majority

opinion.[1] However, for the reasons I now explain, I respectfully dissent from the

majority's affirmance of the restitution orders with respect to the retirement benefit and

the healthcare embezzlement convictions.

## I.    BACKGROUND

As the majority opinion notes, at Mr. Maynard's direction in 2017, Touchbase

Global Services, Inc. ("TBGSI") used money withheld from employees' paychecks

designated to retirement plans and health insurance plans to instead pay for operating

expenses. TBGSI incentivized participation in the retirement plan by offering matching

contributions, but later stopped paying the matching contributions without notifying its

employees. In addition, TBGSI withheld money from employee paychecks ostensibly to

pay for employee health insurance. Unbeknownst to the employees, TBGSI failed to pass

along the employee withholdings to the appropriate health insurance company. As a

---

[1] I also concur in the majority's conclusion that an accurate calculation of employees' deductibles would not have been possible based on the evidence presented. But because, as discussed in section II.B, I am convinced the restitution amount for the embezzlement of healthcare premiums is otherwise embedded with plain error, I dissent from the majority's affirmance of that award.

result, two successive insurers retroactively cancelled health insurance coverage for TBGSI's employees, resulting in unpaid claims the insurance would have covered.

For his conduct in embezzling the employee withholdings, the grand jury charged Mr. Maynard with, and the petit jury convicted him of, one count of conspiracy to embezzle employees' retirement contributions and health insurance payments, in violation of 18 U.S.C. § 371[2]; ten counts of theft or embezzlement of employee benefit plan funds, in violation of 18 U.S.C. § 664; and thirteen counts of theft or embezzlement in connection with health care, in violation of 18 U.S.C. § 669.[3]

On the retirement benefit embezzlement counts, over Mr. Maynard's objection, the district court ordered restitution, including "the employer matching contribution for each victim for 2017 because the employees were enticed to participate in the 401(k) program by the promise of a generous employer match" which was never paid. ROA, Vol. VII at 1470–71. The district court also included lost interest on the employees' contributions. In total, the district court ordered Mr. Maynard to pay $111,974.04 in restitution for embezzlement of the retirement benefits.

On the health insurance premium embezzlement counts, the district court ordered Mr. Maynard to pay $185,921.91 in restitution. This amount "is comprised of $50,279.04

---

[2] The district court did not order restitution on this count.

[3] Mr. Maynard was also charged with corruptly endeavoring to obstruct or impede due administration of the internal revenue laws in violation of 26 U.S.C. § 7212(a) and conspiring to avoid paying taxes in violation of 18 U.S.C. § 371. Because I join in the majority's analysis of Mr. Maynard's arguments with regard to those claims, I do not discuss them here.

for the premium withholdings from the employees' paychecks that were stolen[,] $40,204.32 in unpaid claims for UnitedHealthcare[, a]nd $95,438.55 in unpaid claims for Anthem." *Id.* at 1468.

## II. DISCUSSION

Restitution must be authorized by statute. *United States v. Mendenhall*, 945 F.3d 1264, 1267 (10th Cir. 2019). The restitution here is governed by the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A. The MVRA directs courts to order "'that the defendant make restitution to the victim' of 'an offense against property under this title.'" *United States v. Howard*, 887 F.3d 1072, 1076 (10th Cir. 2018) (quoting 18 U.S.C. §§ 3663A(a)(1), (c)(1)(A)(ii)). "The overarching principle of the MVRA is to make victims whole." *Id.* at 1078. Thus, restitution under this section ordinarily constitutes the return of the victim's property, but if that is impracticable, the value of the property. *Id.* at 1076. The government has the burden of proving the restitution amount. *Id.* "[T]he controlling metric for an award of restitution pursuant to the MVRA *in every case* is *actual* loss suffered; nothing more, nothing less, to ensure that the victim does not receive a windfall." *Id.* at 1078 (internal quotation marks omitted).

### A. *Retirement Benefit Restitution*

On the 18 U.S.C. § 664 counts, the district court found that "the full amount of the victims' 401(k) losses includes the employer matching contribution for each victim for 2017 because the employees were enticed to participate in the 401(k) program by the promise of a generous employer match." ROA, Vol. VII at 1470. The district court therefore included in the restitution amount the unpaid matching contributions in addition

3

to the embezzled withholdings and interest. Mr. Maynard argues this was improper because "the loss caused by the 'offense of conviction' was the funds stolen from the employees' paychecks," not the unpaid matching contributions. Appellant Br. at 24. The government argues the unpaid matching contributions are compensable because they were losses created by false representations and are necessary to make the victims whole.

As the majority notes, there is no dispute that Mr. Maynard (and Ms. Elbers) fraudulently represented that employer matching contributions would be made to the 401(k) program, thereby enticing employees to participate in the program and providing an opportunity to embezzle the employees' contributions. The majority thus concludes "the government carried its burden of showing that . . . the loss to each employee-victim necessarily included the promised employer-matching contribution that was associated with each 401(k) contribution." Majority Op. at 29. And like the government, the majority cites *United States v. Kalu*, 791 F.3d 1194 (10th Cir. 2015), in support, reading that case to authorize restitution for misrepresentations.

In my view, this court's decision in *Mendenhall* precludes the government's reasoning. The defendant in *Mendenhall* burglarized a pawn shop, stealing (among other things) sixty-two firearms. 945 F.3d at 1266. But he was charged with and convicted of only receipt, possession, and concealment of a stolen firearm based upon three specific firearms. *Id.* Without objection, the district court ordered restitution under the MVRA for other losses related to the burglary, including the other fifty-nine stolen firearms and repair costs the pawn shop incurred after the burglary. *Id.* at 1266–67. "Relying on controlling Supreme Court precedent, we conclude[d] that Congress has authorized

4

restitution only 'for the loss caused by the specific conduct that is the basis of the offense of conviction.'" *Id.* at 1266 (quoting *Hughey v. United States*, 495 U.S. 411, 413 (1990)). "In ordering restitution for losses related to, but not arising directly from, defendant's offense of conviction," this court in *Mendenhall* held, "the district court exceeded the range of restitution authorized by the [MVRA]." *Id.*

The majority's view of *Mendenhall*, from my perspective, is not consistent with its facts. The majority characterizes *Mendenhall* as "reject[ing] the district court's inclusion of restitution amounts for sixty-two stolen firearms because the defendant was only charged with and convicted of receiving, possessing, and concealing three of those firearms." Majority Op. at 29–30. But the restitution order in that case was broader than just the other firearms; it included "wages for employees to conduct inventory, loss of revenue for closing of business (historical average of Saturdays and Mondays), and cleanup/repairs" caused by the burglary. *Mendenhall*, 945 F.3d at 1266–67. So understood, *Mendenhall* establishes it is not enough that these losses are related to the crime of conviction; to be eligible for restitution, the losses must be caused by the conduct underlying that crime.

The majority attempts to distinguish *Mendenhall* because Mr. Maynard's fraud was specified—although not separately charged—in the indictment and the evidence at trial "established that [Mr.] Maynard's promises of employee-matching funds were central" to the retirement benefit embezzlement charges. Majority Op. at 30. The majority suggests the fraud was conduct underlying the offense because "it was those

5

[false] promises that placed [Mr.] Maynard in a position to be able to embezzle or steal the 401(k) contributions." *Id.* at 29.

I do not think these attempted distinctions distinguish *Mendenhall*. True, the indictment in *Mendenhall* listed only three firearms, and that matter did not proceed to trial. 945 F.3d at 1266, 1269. But we did note that there was substantial, undisputed evidence that Mr. Mendenhall had committed the burglary. *Id.* at 1266. Indeed, we stated, "everyone knows that [Mr.] Mendenhall stole the firearms and pocketed cash from the theft." *Id.* at 1269. And there can be no doubt that the burglary was central to Mr. Mendenhall's possessing stolen firearms—absent the burglary, the firearms would not have been stolen or in Mr. Mendenhall's possession. In *Mendenhall*, we relied on a similar Fourth Circuit case; that court "explained that although the defendant's 'burglary and theft of the firearm represent necessary steps in the accomplishment' of the convicted offense, they were 'legally irrelevant for the purpose of restitution.'" *Id.* at 1268 (quoting *United States v. Davis*, 714 F.3d 809, 814 (4th Cir. 2013)). I see nothing materially different in the majority's distinctions.

*Kalu* is not contrary to *Mendenhall*, nor does it create an exception for misrepresentative conduct. In that case, a panel of this court upheld a restitution order that required the defendant to pay his victims as though his false statement had been true. 791 F.3d at 1212–15. But there is a critical distinction between that case and *Mendenhall*: Mr. Kalu was convicted of fraud. *Id.* at 1199–1200 (explaining Mr. Kalu was charged with and convicted of mail fraud and visa fraud, *inter alia*, for recruiting nurses and obtaining visas for them with the false statement that they would earn $72,000 per year,

6

when in fact the nurses earned less than that amount). So, in my view, *Kalu* does not establish that all misrepresentations support an award of restitution. Rather, it holds that where misrepresentation is part of the offense of conviction, a district court may order restitution giving the victims of the misrepresentation the benefit of the promise.

Here, the jury convicted Mr. Maynard of embezzlement of funds from a retirement benefit account. Unlike in *Kalu*, the government did not pursue a conviction for fraud. While promising (falsely) to provide matching contributions was among the means Mr. Maynard used to convince employees to request withholdings, it was not an element of any crime of which Mr. Maynard was convicted. Even if he had matched the contributions as promised, Mr. Maynard would have been just as guilty of violating § 664 when he embezzled the employee contributions. As we explained in *Mendenhall*, district courts may order restitution only for losses caused by the conduct underlying the offense of conviction, not for losses caused by relevant conduct. 945 F.3d at 1269. Losses from conduct enabling, but not constituting, the crime may not be included. *Id.* at 1268. By choosing not to pursue a fraud case against Mr. Maynard, the government made recovery of the promised matching funds unavailable as restitution under the MVRA. *See id.* at 1269. Accordingly, I would hold the district court erred in including the unpaid employer matching contributions as restitution for the convictions under § 664.[4]

---

[4] The majority notes the district court could have awarded this restitution for Count 3, and accordingly any error was harmless. Although the district court could have ordered this restitution on Count 3, it did not do so. It is true "that ordinarily we may affirm on any ground that finds support in the record." *United States v. Garcia*, 946 F.3d 1191, 1207 (10th Cir. 2020) (internal quotation marks omitted). "But ordinarily, in exercising that discretion, we have been—as a matter of basic fairness—guided by

7

## B. *Healthcare Restitution*

Mr. Maynard next challenges the restitution award for his convictions of theft or embezzlement in connection with health care in violation of 18 U.S.C. § 669. In reaching its conclusion that Mr. Maynard could not prevail on this claim under plain error, the majority does not reach the question of whether the district court erred, instead concluding that any presumed error was not plain. In contrast, I begin my analysis of the healthcare restitution issue with that first prong—error—before turning to whether the error was plain.

### 1. **Error**

Mr. Maynard argues the district court erred in two ways: (1) by including both the embezzled premiums and the amount of unpaid claims in the restitution order and (2) by including the full amount of the unpaid claims in the restitution order rather than accounting for expenses such as deductibles which employees would have paid even if they had been covered by insurance as promised. I agree with the majority that Mr. Maynard has failed to come forth with evidence showing that, or how, deductibles

---

whether the parties have fully briefed and argued the alternate ground, and whether they have had a fair opportunity to develop the factual record." *United States v. Chavez*, 976 F.3d 1178, 1203 n.17 (10th Cir. 2020) (internal quotation marks omitted). The government did not ask us to review for harmless error and, consequentially, Mr. Maynard did not discuss it. *See United States v. Cristerna-Gonzalez*, 962 F.3d 1253, 1267 (10th Cir. 2020) ("The government ordinarily has the burden of proving that a non-constitutional error was harmless.") (quotation marks omitted). To my knowledge, this would be the first published opinion of this court to apply harmless error to an MVRA calculation. *See* Majority Op. at 30 n.8 (citing a Sixth Circuit case for the proposition that harmless error applies to an MVRA calculation). I would not do so for the first time on our own initiative.

would have applied; and on plain error review we cannot look beyond the record before the district court. However, I believe the district court erred in ordering restitution for both the embezzled premiums and the unpaid claims.

Mr. Maynard argues that absent his criminal conduct, his employees' withholdings would have been passed on to the health insurers, and the employees would have been covered. So, in his view, their loss is either the embezzled premiums or the unpaid medical claims, but not both. He argues that restitution for both the amount of premiums and the unpaid medical expenses puts the employees in a better position than they would have been in if, in fact, the withheld amounts were used to purchase health insurance. The government disagrees, arguing that the embezzled premiums represent the loss of protection against risk that health insurance provides, while the out-of-pocket payments compensate costs actually incurred.

I agree with Mr. Maynard. Victims who receive both reimbursement of the premium amounts withheld from their paychecks and out-of-pocket expenses incurred when the insurers retroactively revoked coverage will recover more than they would have received if Mr. Maynard had not embezzled their premiums. That is an impermissible windfall under the MVRA.[5]

---

[5] The majority is concerned that this result "would effectively reward [Mr.] Maynard financially by allowing him to retain the embezzled health insurance premiums" and suggests such a "reward" is unsupported. Majority Op. at 37 n.12. But restitution is about restitution, not disgorgement. "The overarching principle of the MVRA is to make victims whole." *United States v. Howard*, 887 F.3d 1072, 1078 (10th Cir. 2018).

9

At oral argument, counsel for Mr. Maynard posited that the best way to calculate restitution would be by examining each employee individually and utilizing the greater of the embezzled premiums or the unpaid insurance claims. This would put each employee in a position as though Mr. Maynard's crime had not been committed. For persons who incurred less in healthcare expenses than the stolen premiums, the restitution award would be the value of insurance coverage—that is, the total of the stolen premiums. For employees who incurred healthcare expenses that exceeded the cost of the stolen premiums, however, the proper amount of restitution would be the amount the insurance company would have paid in health care benefits if coverage were in effect. I agree with Mr. Maynard that awarding both the premium amounts and the amount of healthcare expenses puts the employees in a better position than if Mr. Maynard had not stolen the premiums. Under the district court's award, the employees receive the benefit of health insurance, without the burden of an insurance premium.[6] Again, I think this exceeds the authority granted by the MVRA.

---

[6] The majority suggests there are two categories of losses here—the embezzlement of premiums and the incurring of medical expenses that would have been covered by insurance—and that these losses must be remedied independently. I respectfully disagree. Insurance premiums represent the amount a person is willing to pay to have someone else cover her medical bills. By providing restitution for the amount of those bills, the court has given the employee the benefit of the bargain made. The employee is entitled to no less and no more. When a person incurs greater covered medical expenses than her premiums, the premiums are simply the cost of having those expenses covered.

## 2. **Remaining Prongs of Plain Error Review**

The majority does not consider whether the district court erred, but rather holds any error was not plain or did not affect Mr. Maynard's substantial rights. Generally, however, an error in fashioning the restitution order resulting in the restitution amount exceeding the losses caused by the conduct of conviction will meet the three remaining prongs of the plain error analysis. *United States v. Herndon*, 982 F.2d 1411, 1420 (10th Cir. 1992); *United States v. Guthrie*, 64 F.3d 1510, 1514 (10th Cir. 1995); *United States v. Gordon*, 480 F.3d 1205, 1212 (10th Cir. 2007); *United States v. Zander*, 794 F.3d 1220, 1233 (10th Cir. 2015). *But see United States v. Anthony*, 942 F.3d 955, 974 (10th Cir. 2019) (holding a defendant failed to show plain error on the plainness prong despite agreeing there was error); *United States v. Zhou*, 717 F.3d 1139, 1156 (10th Cir. 2013) (holding an alleged restitution error was not plain). As discussed below, I would hold that the error in including both insurance coverage and the insurance premiums was plain under our precedent and affected Mr. Maynard's substantial rights.

As to the plainness of the asserted errors, the majority faults Mr. Maynard for citing only general principles which "do not address the specific and unique situation that is presented in this case regarding the restitution amounts associated with" the charges here. Majority Op. at 35. It then reasons that forcing the district court to award an amount reflecting only premiums or only unpaid claims would undercount employees' losses. Considering the employees separately and providing the greater of the unpaid claims or premiums, the majority believes, would require more evidentiary support and possibly mini-trials at sentencing.

11

As an initial matter, I am untroubled that the plainness of the district court's error is evident from general principles governing restitution awards as opposed to a case factually identical to this one. Our precedent unambiguously demands that a restitution award make the victims whole, but not grant them a windfall. *Howard*, 887 F.3d at 1078; *see also Zander*, 794 F.3d at 1233. Here, it was obvious the restitution order put the employees in a better position than they would have been if Mr. Maynard had not stolen the premiums. The restitution award provides the employees all the benefits of health coverage, without the corresponding premium expense. In my view, that is a classic windfall.

Like the majority, however, I agree the district court could not have equitably treated all the employees the same. By awarding restitution based solely on premium amounts, for example, some employees who had high healthcare expenses would not be made whole. And if instead restitution were based only on healthcare expenses, those employees who were lucky enough not to have incurred uninsured expenses would still have suffered the uncompensated loss of their premiums. But, unlike the majority, I am not convinced that calculating the restitution amount by taking the greater amount as between the unpaid premiums and the uncovered healthcare expenses of each employee would be too difficult. The schedules provided to the district court, without objection, included totals for each employee of the premiums stolen and the healthcare expenses incurred. A simple reference to that document to determine which amount is higher is all that would be required to award restitution sufficient to make the employees whole, without providing them with a windfall. Under these circumstances, I see little risk that a

12

full-blown trial would be required to calculate restitution. Instead, a restitution amount could have been easily calculated by including the higher of each amount—but not both amounts—for each employee.

Regarding the substantial rights prong of plain error, the majority is "unable to say there is a 'reasonable probability' that the restitution amount for Counts 14 through 26 would have been lower had the district court engaged in a detailed analysis of each employee-victim's situation." *Id.* at 40. I respectfully disagree.

According to Mr. Maynard, the district court should have ordered only the amount of each employees' embezzled premiums or the amount of unpaid healthcare expenses, whichever is higher. The restitution award adopted by the district court includes both amounts. If we agree—as I do—with Mr. Maynard, the amount of the restitution order will necessarily be reduced by eliminating the lesser of those amounts for each employee. The error therefore affected Mr. Maynard's substantial rights. *See Mendenhall*, 945 F.3d at 1269.

Finally, this court's precedent compels the conclusion that this error affected the fairness, integrity, or public reputation of the judicial proceedings. "[W]e have already determined that where a court orders restitution in an amount that exceeds the loss caused by a defendant's offense in violation of 18 U.S.C. § 3663A, such an order amounts to an illegal sentence." *Mendenhall*, 945 F.3d at 1270. And an illegal sentence affects the fairness, integrity, or public reputation of the judicial proceedings. *Id.* ("[I]mproper restitution can thereby affect the fairness, integrity, and public reputation of judicial

13

proceedings."). Accordingly, I would reverse the district court's award of restitution on the healthcare benefit embezzlement and remand for a recalculation.

### III.    CONCLUSION

I would hold the district court erred in its restitution calculations pertaining to the §§ 664 and 669 convictions, and that its error regarding the unpreserved challenge to the latter convictions was plain. I therefore respectfully dissent from the majority's contrary conclusions as to those issues.